**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| DAVID D. BROWN, | Civil Action No.: |
| Plaintiff, | |
| v. | 5:22-cv-00395 |
| SPECTRUM COMM. INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

**COMPLAINT**

COMES NOW, Plaintiff David D. Brown and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (hereinafter, "Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (hereinafter "Section 1981"). Plaintiff alleges that Defendant Spectrum Comm. Inc. subjected Plaintiff to discrimination based on his race and to retaliation for Plaintiff's participation in protected activities, all resulting in the termination of Plaintiff's employment, and respectfully shows the Court as follows:

**JURISDICTION AND VENUE**

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5.

2.

Venue is proper in this judicial district because the events underlying this action, occurred in Houston County, Georgia, which is located in this judicial district, pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

## PARTIES

3.

Plaintiff David D. Brown (hereinafter, "Plaintiff" or "Scott") is a citizen of the United States and a resident of the State of Georgia. At all times relevant to this suit, Mr. Brown was employed and continues to be employed by Defendant. Mr. Brown is a covered, non-exempt employee under all laws referenced herein.

4.

Defendant Spectrum Comm. Inc. (hereinafter, "Defendant") is foreign profit corporation, incorporated under the laws of the State of Delaware and authorized to do business in the State of Georgia.  Defendant's principal office is located at One Bayport Way, Suite 300, Newport News, Virginia 23606.  Defendant may be served with process through its Registered Agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Gwinnett County, Georgia 30092.

5.

Defendant is a private corporation that provides professional services and technical solutions to federal defense and intelligence agencies and other private corporations.  Defendant is engaged in interstate commerce, has annual revenue in excess of $500,000.00, and has employed in excess of fifteen individuals in 2021 and in prior calendar years.

6.

Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act.

## STATEMENT OF FACTS

7.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 6, as if the same were set forth herein.

8.

Mr. Brown is a black, or African American, male.

9.

When Mr. Brown applied to work for Defendant, he had already gained a wealth of experience that should have been relevant and helpful with his role with Defendant.  Mr. Brown had served for approximately eleven years in the United States Navy.  Mr. Brown also held several supervisory positions, including one in which Mr. Brown had been able to secure a $16 million contract for weapons and components, and Mr. Brown had recently served as a warehouse manager with a large company in Macon, Georgia.

10.

It was because of Mr. Brown's experience that, when he was being considered for the position of Material Handler or Material Handling Specialist, Site Lead Warren Oliver (hereinafter, "Site Lead Oliver") recommended that Mr. Brown accept any job offer, and then they could work on obtaining a promotion to the position of Material Manager soon after Mr. Brown began working.

11.

Defendant offered Mr. Brown a position as a Material Handling Specialist, and he began working on or around June 19, 2019.

12.

Mr. Brown was assigned to work at Robins Air Force Base, where Defendant had a contract with the United States Air Force.

13.

Defendant is one of several contractors that work out of the same location at Robins Air Force Base, and it is common for employees of the various contractors to work both alongside one another as well as with employees of the Air Force.

14.

Chris Craven, a white male, was an employee of Ginn Group, one of the other contractors working out of Robins Air Force Base.  Mr. Craven served as the Floor Manager (hereinafter, "Floor Manager Craven") of the facility in which Mr. Brown was ultimately assigned.

15.

While Floor Manager Craven did not have had the ability to hire, fire, or counsel Mr. Brown, it was his responsibility to supervise Defendant's material handlers at this location, including Mr. Brown.

16.

When Mr. Brown was hired, he was told that Defendant needed him to work on the warehouse floor as a result of Mr. Brown's experience in his prior roles.

17.

Despite his lack of hiring and firing authority, Floor Manager Craven was in Mr. Brown's chain of command and served as one of Mr. Brown's supervisors.

18.

Beginning in early 2020, Mr. Brown began encountering significant challenges with Floor Manager Craven.

19.

For example, Mr. Brown began to notice that Floor Manager Craven would provide assistance and support to white employees, but he would ignore the black employees he supervised and refuse to provide any assistance.

20.

Floor Manager Craven would also publicly ridicule black employees for the same conduct that he would overlook or ignore when the white employees were responsible.

21.

One example of the lack of support that Floor Manager Craven would give to black employees arose in early 2020 when Mr. Brown began exhibiting symptoms consistent with COVID-19 infection.  Unlike the white employees, whose duties would be covered by others when they had to be out of work on leave, Floor Manager Craven refused to reassign Mr. Brown's duties while he was in quarantine.  During this time, Mr. Brown knew that there were several critical deadlines approaching, and despite asking for help and having other employees who were available to fill in, Floor Manager Craven simply refused to provide coverage during Mr. Brown's leave.

22.

Ultimately, around this time, Mr. Brown felt the need to speak to his supervisor, Site Lead Warren Oliver, about Floor Manager Craven's conduct.  Site Lead Oliver said that he would handle the problem, but it later became apparent to Mr. Brown that Site Lead Oliver only made that statement to appease Mr. Brown.  Site Lead Oliver did not take any apparent action to address or remedy Mr. Brown's complaints.

23.

Around the same time that Mr. Brown raised his concerns with Site Lead Oliver, Floor Manager Craven sent a request to be friends with Mr. Brown on Facebook.  Since Mr. Brown had not been friendly with Floor Manager Craven at work, he just assumed that Craven was trying to be nosey.

24.

Mr. Brown had one post on Facebook, paying tribute to a FedEx delivery driver, a black male whom many of Defendant's employees knew because of his deliveries, who had recently passed away from COVID-19.  Floor Manager Craven "reacted" to Mr. Brown's post with an emoji that appeared to be laughing.

25.

Mr. Brown found Floor Manager Craven's reaction to be disturbing, but it was consistent with other insensitive and offensive remarks that Floor Manager Craven would say at work.

26.

Once Floor Manager Craven made contact with Mr. Brown on Facebook, Mr. Brown observed that many of Floor Manager Craven's posts were similarly insensitive.  For example, Floor Manager Craven had several posts that were clearly intended to be demeaning to his coworkers, including one that explicitly referred to other employees as "clowns."

27.

Floor Manager Craven had other posts on his Facebook page that included comments that were both implicitly and explicitly racist.  For example, he posted a meme suggesting that, instead of standing for "Black Lives Matter," "B.L.M." meant "Belt Loops Matter," further stating "Pull Up Your Pants."  Floor Manager Craven also posted a meme that referred to a black member of

the U.S. House of Representatives as "ignorant" and having to work hard to "remain stupid." And there were several posts about the then-Democratic nominee for Vice President of the United States – one saying that she was "not black," another referring to her a "Jamaican Woman" who was hired to care for an elderly white man, and another meme containing double entendre referring to her as a slang term for a prostitute or promiscuous woman.

28.

By March 2020, Floor Manager Craven's conduct had become increasingly toxic and Site Lead Oliver had clearly failed to act on Mr. Brown's complaint, all of which resulted in Mr. Brown feeling the need to report the conduct to Defendant's Human Resources Manager, Suzanne Unsworth (hereinafter, "HR Manager Unsworth"), which he did by email on March 6, 2020.

29.

Another one of Defendant's black employees, Sherod Brooks, joined Mr. Brown in reaching out to HR Manager Unsworth, and the men specifically asked to meet with the HR Manager to discuss concerns regarding race in the workplace.

30.

However, HR Manager Unsworth was known to Mr. Brown as being someone who often made it appear that she was helping with employee concerns, but that her primary motivation was to protect the interests of the company.

31.

Apparently, another one of Defendant's employees, Andrea Graham, had also raised concerns to HR Manager Unsworth around the same time about new tensions that she had noticed in the workplace when she had recently returned from leave.

32.

Soon after these employees expressed their concerns, a group of several of Defendant's black employees, including Mr. Brown, Mr. Brooks, Ms. Graham, Dedric Harbor, met with HR Manager Unsworth to discuss their concerns. During the meeting, Mr. Brown also mentioned concerns that Joseph Alston, a black male who was previously employed with Defendant but who was working for another contractor at the same site at that time, had also expressed about disparate treatment based on race in the workplace.

33.

During said meeting, Mr. Brown also told HR Manager Unsworth about an incident he encountered during his military service, which resulted in Mr. Brown being susceptible to high blood pressure and anxiety, and the fact that Floor Manager Craven had violated Mr. Brown's HIPAA rights.

34.

After this meeting, some combination of Defendant's management and representatives from the Ginn Group, apparently met with Floor Manager Craven to address the concerns that had been discussed in the meeting with HR Manager Unsworth.

35.

After the meeting, it appeared to Mr. Brown that the workplace had improved for a week or two.

36.

However, the culture soon returned to how it had been before the meeting with the HR Manager.  Mr. Brown subsequently found that these racial tensions in the workplace increased

even more around the time of the death of George Floyd and the resulting protests a little over two months later.

37.

In late March 2020, as a result of the COVID-19 pandemic, Defendant restructured its employee's assignments and schedules, so as to reduce the number of employees on a shift to only two or three and the set shorter, six-hour shifts.

38.

While these COVID-19 precautions may have been intended to protect the health of employees, the result was that the entire facility became overburdened and there were additional delays in the handling of material as a result.

39.

Previously, on December 19, 2019, Site Lead Oliver asked Mr. Brown to come to his office. When Mr. Brown arrived, he was asked to turn over his security badge.  Mr. Brown complied, and Site Lead Oliver handed Mr. Brown a new security badge that included the title "Material Management Specialist."  Site Lead Oliver then shook Mr. Brown's hand and congratulated him on his promotion.  Soon thereafter, Mr. Brown sent a text message to his wife to let her know the good news.

40.

Defendant's Material Managers are responsible for precuring certain classified materials for aircraft produced on the base.  After an order has been placed, the Material Manager assigned to such material is responsible for tracking the classified material as it is shipped across the country to the base.  The Material Manager's duty is not relived until after such classified materials have been received and signed-for by one of Defendant's Material Handlers at the base.

41.

Critically, one of Defendant's most important functions with regard to classified materials is to ensure that such material blends in with other non-classified shipments that are received at the base. This is to ensure that classified material may be shipped without detection.

42.

Prior to the pandemic, Defendant assigned employees to three shifts or teams, and each shift would include a Floor Manager assigned to the team, one Material Manager to handle purchase orders and to manage material being shipped to the warehouse, and several Material Handlers who work in the receiving department of the warehouse.

43.

At the conclusion of each shift, Defendant's employees are supposed to hand-off the materials for which they were personally responsible to their counterpart on the arriving shift.

44.

However, in addition to reducing the time of shifts and number of employees assigned because of the pandemic, Defendant also sent its Material Managers home to work remotely while the Material Handlers remained in the warehouse.

45.

As a result of his December 2019 promotion, Mr. Brown was one of Defendant's few non-white Material Managers. However, Defendant failed to increase Mr. Brown's pay accordingly, and Mr. Brown had also previously complained that he was still being made to do work that was generally the responsibility of Material Handlers.

46.

Moreover, Mr. Brown was the only Material Manager from any shift who was not permitted to work remotely, and required to be on site, at the start of the pandemic.

47.

Prior to the pandemic, Material Handlers were expected to open and inspect each and every delivery, regardless of their classification, and send an email to the assigned Material Manager of the arrival of such material.

48.

However, having to open and inspect every delivery apparently resulted in repeated issues in which Defendant's Material Handlers were not always catching and identifying all of the sensitive materials delivered.

49.

As a result, Defendant issued a new policy and procedure in or around September 2020. Material Handlers were then required to immediately inspect items that had been identified on a report of shipment, or "REPSHIP," as classified, and process those items first. The other, non-classified items would be staged in groups, in which they would be processed as early as possible, and with priority given to the materials that had been delivered earliest. Accordingly, Material Handlers were supposed to process classified materials first, and then the deliveries that were not clearly marked as being classified would be opened and inspected in order of receipt.

50.

Even though Mr. Brown was not only supposed to be working remotely and not opening and inspecting deliveries because of his promotion the prior year, he followed the new policies and procedures that Defendant announced in Fall 2020.

51.

On one occasion in Fall 2020, Material Manager Tiffany Reid (a while female), who was working remotely like all others in her position except Mr. Brown, failed to send the appropriate "REPSHIP" to any of her coworkers concerning classified materials that were expected to be delivered.

52.

The non-descript package, for which Mr. Reid was ultimately responsible, arrived in the warehouse on October 7, 2020.

53.

However, because Ms. Reid failed to send a "REPSHIP," nobody else was aware that this classified material had been delivered.

54.

On October 16, 2020, nine days after the delivery of the material at issue, Mr. Brown was processing other materials when he found what appeared to be classified material.

55.

Mr. Brown then found that he had been the one who signed for the package nine days earlier – although, it should be noted that Material Handlers generally sign for receipt of these packages.

56.

However, because Ms. Reid had failed to provide the required form with the package, there was no way for Mr. Brown to have known that he had signed for delivery of material that was supposed to be classified.

57.

Based on the new policies and procedures that Defendant had announced the prior month, Mr. Brown did not open, inspect, and process the delivery at issue since it had not been identified with a REPSHIP.

58.

After making this discovery on October 16, 2020, Mr. Brown reported the incident to his supervisors.

59.

Mr. Brown was then subjected to an interview with security personnel and an investigation.

60.

After taking several days of leave for unrelated reasons, Mr. Brown returned to work only to be summed into Site Lead Oliver's office, along with another coworker, and Anthony Stoney, a member of senior management, present via telephone.

61.

Mr. Stoney described the incident as a security violation and told Mr. Brown that was going to be terminated.

62.

Prior to this incident, Mr. Brown had only received one prior write up for retrieving a personal item out of his vehicle, something that Mr. Brown had been expressly told was acceptable by management, it was something that Mr. Brown had seen his white coworkers do on previous and routine occasions.

63.

In addition to firing Mr. Brown, Defendant took his Common Access Card, and immediately escorted him out of the building.

64.

Critically, this incident did not result in any investigation, disciplinary action, or any adverse action from defense or intelligence agencies and Mr. Brown's security clearance was not impacted as a result of the incident.

65.

This incident would not have occurred if Mr. Brown had been treated like other, white, Material Managers, as he would have been working remotely and would not have been forced to work in receiving and doing the job duties of a Material Handler.

66.

Moreover, Mr. Brown had no way to avoid the incident that Defendant cited for his termination as it was the result of a coworker's complete failure to do her own duties.

67.

In addition to being treated differently than Defendant's other Material Manager who are white, Mr. Brown was fired for something that had been the responsibility of a white colleague.

68.

Defendant did not terminate Ms. Reid's employment.

69.

Ms. Reid did not receive any disciplinary action as a result of this incident.

70.

Upon information and belief, Ms. Reid has not engaged in any protected activities.

71.

Since Mr. Brown's termination, three of Defendant's other white employees have engaged in similar failures to identify and process similar, classified materials, and in both incidents the classified material sat unsecured for multiple days. However, neither of these employees received any disciplinary action.

72.

These three employees are also not known to have engaged in any protected activities.

73.

With regard to one of the three employees, Mr. Brooks was the one who discovered the classified item and then immediately reported it to his supervisor on the morning of December 28, 2020. It was one of Defendant's white employees, Jim Jones, whose name was identified on the package and who had been responsible for keeping it secured. Despite this material sitting in an unsecured location for at least six days, Mr. Jones was not subjected to any disciplinary action.

74.

In a January 14, 2022 letter from counsel to an investigator with the Equal Employment Opportunity Commission, Mr. Brown identified Mr. Brooks as witness to some of the aforementioned incidents concerning failures to identify and secure classified material. Mr. Brown had previously provided Mr. Brooks' name to the EEOC as being one of the employees involved in discussions about racial tensions in the workplace.

75.

On February 16, 2022, Defendant terminated Mr. Brooks employment. Several weeks earlier, Defendant overhauled its system for keeping time. After this change, there were a number of employees who were having problems entering their time into the system. Mr. Brooks was only

of the employees who had such problems, but Defendant zeroed in on Mr. Brooks, accused him of violating company policy for not entering his time, and terminated Mr. Brooks employment.

<u>Procedural/Administrative Background</u>

76.

On April 1, 2021, Mr. Brown filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she was being subjected to continuing discrimination based on race from February 2020 until his October 26, 2020 termination. The EEOC assigned Mr. Brown Charge Number 410-2021-04013.

77.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings, and were represented by counsel at the time.

78.

On or about August 8, 2022, the EEOC issued a Determination and Notice of Rights, which Mr. Brown received through counsel the same day.

79.

Mr. Brown has exhausted his administrative remedies as to the claims in his Charge of Discrimination, and he is filing the instant action within ninety days of the EEOC's issuance and Mr. Brown's receipt of said Notice of Right to Sue.

**COUNT I:**
**DISCRIMINATION BASED ON RACE**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

80.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 79, as if the same were set forth herein.

81.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's race.  42 U.S.C. § 2000e-2(a).

82.

Plaintiff is considered in a protected class as his race is black or African American.

83.

As alleged herein, Plaintiff was qualified for the position that he held with Defendant and his performance was exemplary at all times.

84.

As alleged herein, Plaintiff received a promotion to the position of Material Manager on or about December 19, 2020.

85.

However, despite said promotion, Plaintiff later discovered that Defendant failed to increase Plaintiff's pay due to such promotion.  As a result, Plaintiff continued to be paid the same rate as a Material Handler, and Defendant failed to provide Plaintiff with compensation comparable to similarly situated employees, none of whom were black, also in the position of Material Manager.

86.

Similarly, as a result of precautions for the COVID-19 pandemic, Defendant allowed all of Material Manager to work remotely in order to reduce the number of individuals in the workplace.

87.

However, unlike his similarly situated Material Managers, none of whom were black or African American., Defendant required Plaintiff to continue to be physically present in the workplace.

88.

At the same time, unlike his similarly situated coworkers, none of whom were black or African American, Defendant required Plaintiff to perform duties associated with the position of Material Handler, despite Plaintiff's promotion to Material Manager.

89.

As alleged herein, in October 2020, Defendant immediately terminated Plaintiff's employment for a situation for which one of Plaintiff's white colleagues had been responsible.

90.

Defendant failed and refused to discipline or terminate Plaintiff's white colleague for the conduct at issue.

91.

As alleged herein, there have been a number of other occasions in which Defendant's white employees who are similarly situated to Plaintiff were found by Defendant to have engaged in, and been specifically responsible for, conduct similar to that resulting in the termination of Plaintiff. However, Defendant failed or refused to terminate said individuals' employment, or at times, even subject them to any disciplinary actions.

92.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory reasons for the acts and omissions raised herein and for otherwise treating Plaintiff less favorably than his similarly situated counterparts who are not black or African American.

93.

Plaintiff will prove that Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's race.

94.

Plaintiff has been injured by Defendant's discrimination against him based on race, and he is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages, in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II:
## RACIAL DISCRIMINATION
## IN VIOLATION OF SECTION 1981

95.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 79, as if the same were set forth herein.

96.

As a black or African American man, Plaintiff has the same right to make and enforce contracts as his white counterparts, which cannot otherwise be impaired by nongovernmental discrimination or impairment under color of State law. 42 U.S.C. § 1981.

97.

For the reasons set forth in Counts I, *supra*, which are incorporated herein, Defendant is liable to Plaintiff for infringing upon his right to make and enforce contracts and to the full and equal benefit of all laws as is enjoyed by white citizens.  As a result, said Defendant is liable under Section 1981, and Plaintiff is entitled to all damages available to her in an amount to be proven at trial.

## COUNT III:
## RETALIATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT

98.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 79, as if the same were set forth herein.

99.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to retaliate against an employee because he has opposed any unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a).

100.

As alleged herein, in and around March 2020, as well as on other occasions, Plaintiff complained to both to his direct supervisor and to Defendant's manager of Human Resources about disparate treatment in the workplace based on race and conduct that Plaintiff believed was discriminatory based on Plaintiff's and other's race.

101.

While Defendant took some action concerning Plaintiff's and other's complaints, Defendant failed to adequately remedy and address the discriminatory treatment.

102.

As alleged herein, Defendant terminated Plaintiff's employment because of Plaintiff's reports to management about the discriminatory conduct.

103.

Defendant will be unable to present any evidence of a legitimate, nonretaliatory reasons for the acts and omissions raised herein and for otherwise treating Plaintiff less favorably than his similarly situated counterparts who did not engage in protected activities.

104.

Plaintiff will prove that Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's participation in the aforementioned protected activities.  Such proof includes the fact that, as alleged herein, Defendant has terminated others based on their participation in protected activities.

105.

Plaintiff has been injured by Defendants' retaliatory conduct in response to Plaintiff's participation in protected activities, and Plaintiff is entitled to all damages allowed under the Title VII of the Civil Rights Act, including compensatory damages, reinstatement, backpay, injunctive relief, punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE. Plaintiff David D. Brown respectfully prays for the following relief:

(a)     The Summons and Process be issued to Defendant Spectrum Comm. Inc., and that said Defendant be served as provided by law;

(b)     That this matter be tried before a jury;

(c)     That judgment be awarded for and in favor of Plaintiff David D. Brown and against Defendant Spectrum Comm. Inc. on Count I for discrimination based on race, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act of 1964;

(d)     That judgment be awarded for and in favor of Plaintiff David D. Brown and against Defendant Spectrum Comm. Inc. on Count II for discrimination based on race, and grant Plaintiff all relief allowable under Section 1981;

(e)     That judgment be awarded for and in favor of Plaintiff David D. Brown and against Defendant Spectrum Comm. Inc. on Count II for retaliation for his participation in protected activities, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act of 1964;

(f)     For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 4th day of November, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: (478) 841-9007
Facsimile: (478) 841-9002
keb@cooperbarton.com